**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DENNIS LEE LEVINE,

　　　　　　　　　　　　　　　CASE NO. 2:17-cv-13201

　　　　　*Plaintiff*,　　　　　　DISTRICT JUDGE STEPHEN J. MURPHY, III

*v.*　　　　　　　　　　　　MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

　　　　*Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 15)

## I.　　RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff Dennis Levine is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion, (Doc. 15), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.　　REPORT

### A.　　Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits. The case is presently before the Court upon the parties' cross-motions for summary judgment. (R. 13, 15.)

1

Plaintiff filed his present application for Title II Disability Insurance Benefits on October 16, 2013, alleging that his disability began June 30, 2005.[1] (Agency Record, R. 7, 190-91.) The Commissioner denied the claim. (R. 7, 89-98.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on November 30, 2015. (R. 7, 26-87, 112-14.) The ALJ issued a decision on May 23, 2016, finding Plaintiff not disabled during the relevant period. (R. 7, 11-20.) On July 20, 2017, the Appeals Council denied review, (R. 7, 1-3), and Plaintiff filed for judicial review of that final decision on September 29, 2017. (Pl. Compl., R. 1). He then filed the instant Motion for Summary Judgment on March 21, 2018, (Pl. Br., R. 13), and the Commissioner countered with its own Motion two months later, (Def. Br., R. 15). Plaintiff has replied, (Pl. Reply, R. 16), and the case is now ready for resolution.

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

---

[1] As explained more below, Plaintiff filed an application for benefits in 2007, which was denied without appeal, and another in 2010.

to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the

> duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Levine was not disabled. (R. 7, 11-20.) At step one, the ALJ found that the last date Plaintiff could claim insurance for (i.e., the last date of insured status) was September 30, 2011, and that he had not engaged in substantial gainful activity since his alleged onset date of June 30, 2005. (R. 7, 14.) At step two, the ALJ concluded that Plaintiff had only one severe impairment, major depressive disorder; at step three he decided this impairment did not meet or equal a listed impairment. (R. 7, 14-15.) Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, repetitive tasks (requires little judgment and can be learned in a short period of time); no production line work where somebody else's job responsibilities are directly linked to his output; no interaction with the general public but could have some superficial contact; and occasional interaction with coworkers (not as a team member).

(R. 7, 15.) At step four, the ALJ found Johnson unable to perform any past relevant work. (R. 7, 18.) Finally, at step five, the ALJ determined that Johnson could perform a significant number of jobs in the national economy. (R. 7, 19.)

### E.    Administrative Record

Plaintiff testified at his administrative hearing that he had suffered from depression for as long as he could remember. (R. 7, 48-49.) The precipitating events of the present depression, however, were occupational struggles. Plaintiff was a physician and in 2003 his contract with his hospital was not renewed, forcing him to look for other jobs where he could practice medicine. (R. 7, 49-50.) He found employment through July 2005, but was

5

terminated for "not doing things up to [the employer's] standards." (R. 7, 39, 239.) The subsequent, and thorough, search for jobs turned up only positions he was "less qualified for." (R. 7, 50.) All the while, he "kept getting more and more anxious and more and more withdrawn," beset by depression. (*Id.*) The same year, his wife filed for divorce, leaving Plaintiff shocked and "hopeless." (R. 7, 51.) Decision making became a tremendous burden, even on "simple things like getting out of bed," "what to eat, or even if I was going to eat," he said. (R. 7, 52.) He ruminated, rocking back and forth on his couch for hours at a time. (R. 7, 52-53.)

In February 2005, Plaintiff saw Dr. Joseph A. Skoney, complaining that he was "an emotional wreck." (R. 7, 404.) He felt alienated from friends and wondered if he had bipolar or obsessive-compulsive disorder. (*Id.*) The same month, he began seeing Dr. Jeffrey Kezlarian. (R. 7, 53.) Their treatment relationship lasted until March 2010. (R. 7, 884.) The intake form he filled out in February 2005 explained that he felt hopeless and worthless, had difficulty concentrating, struggled sleeping, lacked interest in activities, and had lost friends. (R. 7, 543.) A note from the next month indicated he might have a job. (R. 7, 778.)[2] Throughout the next few months, Dr. Kezlarian notes kept track of the various prescriptions Plaintiff took for depression. *See, e.g.*, (R. 7, 769-71, 773-76.) In November 2005, he reported that Cymbalta was "somewhat helpful," and that there were "good [and]

---

[2] In March he also saw Dr. Skoney, complaining of depression, decreased energy, and lethargy. (R. 7, 405.) He indicated he was looking for a job and had listed his house for sale. (*Id.*) The following month he reported to Dr. Skoney that he had improved "at least 75%," was less depressed and anxious, and had obtained a job offer. (R. 7, 403.)

bad days." (R. 7, 769; *see also id.* at 801 ("Some days I'm optimistic, some days in a hole."); 809 ("I go up & down.").) Later, in 2008, he said that his mood had gone down while on a different medication. (R. 7, 847.)

Throughout the treatment with Dr. Kezlarian, Plaintiff sometimes noted his discouragement, anxiety, depression, hopelessness, isolation lack of motivation, or idleness, sometimes mentioning his divorce or "job." *See, e.g.*, (R. 7, 754, 755, 757, 773, 775, 804, 808, 811, 838, 839, 847, 848, 850.) He "ran out of gas 4 times," according to one note, though no other context was provided. (R. 7, 826.) Spending time with his daughter made Plaintiff "look[] so much brighter," according to Dr. Kezlarian, but he was "still severely impaired." (R. 7, 816.) At one session he claimed to have been depressed most of his life. (R. 7, 830.)

He also reported doing little to help himself, such as completing disability forms. (R. 7, 816, 842, 847.) In June 2007, he reported that "[t]hings are going okay," but he had run out of money and needed to apply for disability. (R. 7, 800.) Even so, at the next session, in July, he was very distracted, could "barely get through the day," and had not yet filed for disability. (R. 7, 798.)

In February 2006, he was still not working and reported being forgetful, but he said, "I don't really feel depressed." (R. 7, 768.) Again, in 2009, he reported, "I don't feel depressed." (R. 7, 835.) At another session he was "not as depressed" and felt "upbeat." (R. 7, 808.) Other sessions indicated improvement, such as one in 2006 where, under the heading "Response/Progress," Dr. Kezlarian noted that Plaintiff was not feeling "constant anxiety." (R. 7, 754.) Similarly, the next month, Dr. Kezlarian marked Plaintiff's progress

as slow but improving. (R. 7, 752; *see also id.* at 806, 808, 823 (noting slow progress).) In one 2009 session Plaintiff said he was "accomplishing more." (R. 7, 839.) Other notes indicate Plaintiff was stable or tolerating his medication without adverse side effects. (R. 7, 798, 806, 808, 820, 821, 823, 833, 834, 836, 837.)

Session notes also recorded Plaintiff's travels. At a July 2006 session, Plaintiff discussed a recent "tough trip" to Arizona, where Plaintiff's father lived. (R. 7, 61-62, 755.) In January 2009, Plaintiff cancelled a session so that he could fly to Arizona "for a family crisis" involving his father. (R. 7, 840-41.) In March 2010 the notes state he was going to Arizona after his father's wife passed away. (R. 7, 831.)

Throughout the sessions, Plaintiff reported his ongoing job search. (R. 7, 752, 823.) At one point he saw a vocational counselor. (R. 7, 811.) He had let his medical license lapse in 2005, (R. 7, 615), but he went to a continuing medical education course in 2008, (R. 7, 849.)

Dr. Kezlarian provided various opinions of Plaintiff's capacities. In May 2010, he filled out a check box form indicating that Plaintiff was markedly limited in his ability to understand and remember detailed instructions, carry out those instructions, accept instructions, get along with peers, concentrate for extended periods, and perform punctually within a regular schedule; he was moderately limited in his ability to interact with the public, ask for help, behave appropriately, respond to workplace changes, travel to unfamiliar places, set realistic goals, carry out simple instructions, remember locations and work-like procedures, sustain a normal routine without supervision, work near others without distraction, make simple work-related decisions, and complete a normal workday

8

without interruption from psychological symptoms. (R. 7, 863-64, 879-80.) In a short letter dated October 2, 2007, Dr. Kezlarian wrote that Plaintiff "suffers from severe and totally disabling major depression. Despite great effort to treat him, he struggles terribly." (R. 7, 829.) No further explanation was given.

In November 2015, Dr. Kezlarian filled out another preprinted assessment form, providing conclusions on Plaintiff's capacities during the period their treatment period (from February 2005 until March 2010). (R. 7, 884-87.) Dr. Kezlarian thought that Plaintiff would have moderate limitations (meaning a limited ability 20 percent of the time) in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out simple instructions; working close to others without distraction; completing a normal workday; interacting with the general public; maintaining appropriate social behavior; being aware of hazards; traveling to unfamiliar places; setting realistic goals without assistance; tolerating a normal stress level. (R. 7, 885-87.) Plaintiff had marked limitations (i.e., a limited ability 50 percent of the time) in the following areas: understanding, remembering, and carrying out detailed instructions; concentrating for extended periods; performing activities within a regular schedule; getting along with coworkers without distracting them or exhibiting extreme behavior; and responding appropriately to changes at work. Dr. Kezlarian also assessed a Global Assessment of Functioning (GAF) score of 40, (R. 7, 884), which signifies "[s]ome impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." Am.

9

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., 2000) (*DSM IV*).[3] In a checkbox portion of the form, Dr. Kezlarian indicated that Plaintiff's depression was characterized by loss of interest, sleep disturbance, decreased energy, feelings of worthlessness, and difficulty concentrating. (R. 7, 891.)

Around this time, Dr. Kezlarian gave deposition testimony about Plaintiff's condition. (R. 7, 300-53.) During the treatment relationship, Plaintiff was diagnosed with "major depression, recurrent, severe." (R. 7, 306.) Despite his intelligence, Plaintiff could not maintain employment. (R. 7, 306.) Many intelligent people could work around their difficulties, but not Plaintiff—he was "genetically loaded for depression" based on his family history. (R. 7, 307-09.) He had received psychiatric counseling since the 1980s. (R. 7, 310.) During the deposition, Dr. Kezlarian also discussed the results from a Minnesota Multiphasic Personality Inventory (MMPI) plaintiff took in 2006. (R. 7, 310.) (The raw test results can be found at R. 7, 781-96, but they do not offer much explanation of what they signify.) The MMPI is a standardized and objective measure of a person's emotional state, Dr. Kezlarian explained. (R. 7, 310.) The test can ferret out fakers who are merely seeking an opportunity to malinger, which is why he recommended it for Plaintiff. (R. 7,

---

[3] Reliance on GAF scores has been called into question, *see Spuhler v Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *16 (E.D. Mich., June 17, 2014) (discussing caselaw), *rep. & rec. adopted in relevant part by* 2014 WL 4856153 (E.D. Mich., Sept. 30, 2014); *see also Richardson v. Comm'r of Soc. Sec.*, 70 F. App'x 537, 539 (6th Cir. 2014) (noting that the GAF scores alone were "insufficient to undermine the ALJ's decision"), and the leading diagnostic treatise now rejects their use, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013). Nonetheless, "the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence." *Gerstner v. Berryhill*, 879 F.3d 257, 263 n. 1 (7th Cir. 2018). (R. 7,

311.) But Plaintiff's "lie scale" was inconsistent with malingering. (*Id.*) And his "depression scale was the second highest. It's well beyond normal." (R. 7, 311.) The test disclosed that Plaintiff was a chronic ruminator, paralyzed into constant indecision by the constant churning of his thoughts. (R. 7, 312.)[4] This was consistent with Plaintiff's difficulties with paperwork. (R. 7, 313.) These problems would lead Plaintiff off-task for "[e]asily more than" 20 percent of an eight-hour workday. (R. 7, 315.) So severe was Plaintiff's depression that Dr. Kezlarian recommended electroconvulsive therapy, but Plaintiff declined due to the possible effect on his memory. (R. 7, 315-16.) As Plaintiff explained at his hearing, he "thought that if I ever hope to get a job again, I needed to be able to use my memory." (R. 7, 63.)

At the deposition, Plaintiff's lawyer then updated Dr. Kezlarian on all that had happened since 2010, when they last treated. (R. 7, 320.) This included moving to Arizona, moving back, and obtaining work in 2010 in sales and 2012 after he renewed his medical license. (*Id.*) He was presently working as doctor, but it was uncertain whether he would continue. (R. 7, 321.) The lawyer then mentioned that Plaintiff, during his treatment period with Dr. Kezlarian, would play the keyboard and read medical journals—could a severely

---

[4] Another 2006 test, called a Millon Clinical Multiaxial Inventory-II/III, also appears in the records, but does not seem connected with Dr. Kezlarian. (R. 7, 866-75.) It was prepared by Dr. Robert Craig for Dr. Michael Abramsky. (R. 7, 866.) The report contains observations, such as that Plaintiff "may have a tendency toward self-abasement" or that he "tends to lean on other people for security, support, guidance and direction." (R. 7, 868.) It also states that Plaintiff's reported symptoms are associated with anxiety and depression. (R. 7, 874.) All of these brief, more individualized assessments are followed by generalized descriptions of what patients with these characteristics are usually like.

depressed person do these things? (*Id.*) Playing the keyboard was something he could do without thinking, like driving, and he was able to drive to Arizona,  but these abilities would not help him make decisions. (R. 7, 322.) He could also attend a college football game by himself—which he did—because it was "sort of an automatic thing," and Dr. Kezlarian was "not sure he derived tremendous pleasure from it." (R. 7, 324.)[5] And it was passive, not requiring much decision-making. (R. 7, 328-30.) But actions like waking and preparing for work would overwhelm Plaintiff. (R. 7, 330.) Given his depression, it was unsurprising he was briefly jailed for issues regarding child support, had been homeless, and did not file tax paperwork. (R. 7, 335-36.) Any progress after their treatment ended would be consistent with the cyclical nature of depression. (R. 7, 336-37.) Yet, at the same time, Dr. Kezlarian thought that Plaintiff "can function with his adult daily living." (R. 7, 340.) In the end, however, Dr. Kezlarian did not think he effectively intervened in Plaintiff's depression. (R. 7, 348.)

In 2009, Plaintiff also began going to other medical groups for treatment. He returned to Dr. Skoney, noting that he had been off his medication for a month or two but his mood was "okay." (R. 7, 402.) The following month his anxiety and depression were noted as stable, (R. 7, 401), his mood was "good," and certain other (more drastic) treatments were considered for the future "if [his] depression comes back." (R. 7, 400.) He was evaluated at Jewish Family Services in March. (R. 7, 615.) He complained that he had

---

[5] Dr. Kezlarian evidently believed he attended the games alone, but Plaintiff testified he was with friends. (R. 7, 55-56.)

trouble getting out of bed and maintaining basic hygiene. (*Id.*; *see also id.* at 635.) He had a friend, but was not close to his family and his recreation consisted of solitary activities. (R. 7, 616.) The evaluator thought Plaintiff's prognosis was "good," and that he was "a very intelligent man" struggling with "accepting his divorce and unemployment situation." (R. 7, 619.) The initial GAF score was 58, (R. 7, 620), signifying "moderate symptoms" or moderate difficulty in social, occupational, or school functioning. Am. Psychiatric Ass'n, *DSM IV* at 34.

During the ensuing sessions at Jewish Family Services, which lasted into 2010, he sometimes expressed depression and anxiety or stated he isolated himself or had trouble with daily activities such as washing dishes or doing laundry. (R. 7, 625, 626, 627, 628, 635, 643, 647, 648, 650.) He often complained that his medications were not calibrated correctly. *See, e.g.*, (R. 7, 627.) However, he also noted that he had begun to reconnect with friends and was feeling better overall. (R. 7, 629, 632, 633, 644, 646.) In October 2009, he enjoyed attending a "medical dinner/seminar." (R. 7, 644.) Additionally, he was attending lectures that gave continuing medical education credits. (R. 7, 645.) The evaluator thought he was "slowly improving," even after a difficult week spent with family in Arizona. (R. 7, 630.) The improvement was evident to the evaluator because, when Plaintiff was needed, he "was able to not give a second thought to family issues or his depression, and immediately flew to see family when it was needed." (*Id.*) Later, he noted "good days," when he took care of himself, and "bad" days, which still occurred. (R. 7, 636.)

In August 2009, he mentioned that he was applying for Social Security disability based on depression, as his psychiatrist believed he suffered from it; "however, the client

[i.e., Plaintiff] is not convinced." (R. 7, 641.) The therapist who had been treating him, Susan Tobin, wrote that she had "not yet seen any signs of depression that may render him unable to work." (*Id.*) Eventually, however, he decided to apply "based on the fact that he believes he is so unable to make decisions that he can't get/hold a job." (R. 7, 658.)

In December, he planned on travelling to Arizona to stay with his father (perhaps permanently) and also attending a wedding in Colorado. (R. 7, 647.) When he returned, he was glad to be back but nervous about his rapidly depleting funds. (R. 7, 648.) He appeared depressed, but that lifted slightly by the next session; yet subsequently he decided to move to Arizona and had become depressed again. (R. 648-51.) Amidst preparations for the move, however, the therapist thought Plaintiff was "rational and calm" and able to overcome the stress of the moment. (R. 7, 652; *see also id.* at 655.) In June, at his last session, he felt "much better" about the move and "[h]e has been able to make decisions when needed and has said that he believes he is now fully functioning and able to accomplish those tasks that he needs and wants to do." (R. 7, 660.) In a final assessment report, the therapist reported that Plaintiff "has now progressed to a fully functioning independent state" and "has regained much self-confidence and his daily functioning." (R. 7, 611.) His ending GAF score was 67, indicating some "mild symptoms" such as depressed mood or "some difficulty in social, occupational, or school functioning," "but generally functioning pretty well, [with] some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *DSM IV* at 34.

Plaintiff also sought treatment at Community Network Services, beginning in November 2010, after moving back from Arizona. (R. 7, 739.) At that time, he had just

moved from a homeless shelter to his own apartment. (*Id.*) The process for reinstating his medical license was going forward, with the goal that he could "become gainfully employed in the future." (*Id.*) He complained of depression and anxiety, but thought the current mix of medicines helped. (*Id.*) Explaining his work employment record, he stated he "had to quit working because of . . . poor judgment on his part and also poor decision making process." (R. 7, 740.) The evaluator, Dr. Rao Vallabhaneni, marked that Plaintiff had adequate "attention/concentration," impulse control, and judgment. (R. 7, 743.) Plaintiff also had good motivation and good "insight into his condition." (R. 7, 744.) He was assessed a GAF score of 60, (*id.*), indicating "moderate symptoms" or moderate difficulty in social, occupational, or school functioning. Am. Psychiatric Ass'n, *DSM IV* at 34. The GAF scored remained the same in subsequent sessions. (R. 7, 683, 692, 701, 710, 719, 728, 737.)

The following month he obtained work as a salesperson at a home healthcare agency. (R. 7, 732.) He had not been taking one of his medications regularly, but felt anxious only "some times," and his sleep was okay. (*Id.*) Dr. Vallabhaneni's notes indicate that Plaintiff's grooming was average, he was cooperative and behaved within normal limits, his thoughts were goal directed, and his mood, thought content, and speech were normal; his "attention/concentration," impulse control, and judgment were adequate. (R. 7, 734.) These observations stayed constant in most subsequent visits, (R. 7, 680, 689, 716, 725), although his mood was dysphoric in one after he had stopped taking his

antidepressant, (Doc. 7, 707), and anxious in another, (R. 7, 696).[6] A few months later, in February 2011, he reported losing his job. (R. 7, 724.) He felt depressed at times and thought one of his prescriptions was not helping, but he continued seeking reinstatement of his medical license, (*id.*), which he accomplished two months later, (R. 7, 715). He intended to search for jobs. (*Id.*) At one session in August 2011, he stated that he had been isolating himself, which suggested depression; and none of the various antidepressants he had tried were optimal. (R. 7, 687; *see also id.* at 678 (noting that no medication had consistently helped).) The following month he reported that his job search continued with little luck. (R. 7, 678.)

In January 2011, Plaintiff saw Dr. Paul Kaye five times for psychological evaluation and testing. (R. 7, 902-12.) In the short-term, Plaintiff hoped to find work to support himself. (R. 7, 902.) He had recently been homeless after returning from Arizona, where he had moved to live with his father—but while there, he became his father's full-time caretaker and, after a few months, "[t]hings didn't work out." (R. 7, 902, 904.) He described his vocational history: how he lost his job in 2003, worked in emergency care where he struggled with the "archaic computer program," then joined a house call practice before working in private practices. (R. 7, 903.) He was going to investigate renewing his license, perhaps taking a refresher course if an examination was required. (*Id.*) He had received continuing education credits after losing his license, however. (R. 7, 909.) He was estranged from his brother, and his sister was the only family he regularly spoke to, (R. 7,

---

[6] Other physicians from the Group oversaw some of the later sessions. *See, e.g.*, (R. 7, 711.)

902-03), although his relationship with his wife had been good before deteriorating, (R. 7, 908). He did not date or even want to socialize in groups; "I have to force myself to go," he said. (R. 7, 909.) A friend whom he spoke with a couple times each month helped him through the divorce and included him in her family holidays. (*Id.*) Plaintiff also said that apnea caused sleep troubles, and that he had anxiety attacks every few days. (*Id.*)

Dr. Kaye's test results revealed intellectual functioning in the "Very Superior" range and perceptual reasoning and processing speed score in the "Superior" range." (*Id.*) In tasks testing his working memory, he scored at the "Very Superior" and "High Average" levels. (R. 7, 910.) "His Full Scale IQ of 139 . . . suggest[s] he is fully capable of returning to his work as a physician." (R. 7, 910-11.) Dr. Kaye recommended that he pursue relicensing; any problems Plaintiff had with completing paperwork—which had occurred in the past—could be dealt with in therapy. (R. 7, 910.)

A medical consultant for the Commissioner reviewed Plaintiff's records in May 2014. (R. 7, 94.) He concluded that Plaintiff had moderate difficulties in concentration persistence or pace, and mild impairments in activities of daily living and social functioning. (*Id.*) The assessment concluded that Plaintiff could perform simple and routine tasks on a sustained basis. (*Id.*)

Prior to his administrative hearing in November 2015, Plaintiff wrote the ALJ to clarify that he was seeking benefits for a closed period from June 2005 until May 2012

(since he had returned to work during the latter month). (R. 7, 281.)[7]

At the hearing, Plaintiff testified, he had been working for two years at a health care center, and before that, in 2013, he had worked at another medical center but was terminated during the orientation. (R. 7, 38-39.) In 2012 he worked for nearly two months at another health center. (R. 7, 38-39.) And in 2011 he had an interview at Target, but was not hired. (R. 7, 67-68.)

For fun, he would play the keyboard and read novels, medical journals, and newspapers; he also wrote poetry and took a class in Japanese flower arranging. (R. 7, 44, 47.) But his social life was empty, without any friends except one. (R. 7, 45.) He owed child support and had "ke[pt] up with it, for the most part." (R. 7, 46.) At one point, however, he fell behind and was brought before a referee for non-payment, but he made the payment and subsequently the referee substantially lowered his obligation. (*Id.*)[8] He had traveled to Arizona and also attended a family wedding in Colorado, although he felt alienated from his family. (R. 7, 47.) While with his father, he was "[n]ot really" a caregiver, but he would drive them so his father "could get outside and see the sunlight . . . . [and] scenery." (R. 7, 62.)

The biggest challenge, according to Plaintiff, was making decisions. (R. 7, 52.) Even simple ones, like getting up or what to eat, were a struggle. (*Id.*) He ruminated, rocking

---

[7] Some of the records above, particularly a few from Dr. Kezlarian, post-date the hearing but were considered by the ALJ in his written decision. (R. 7, 23 (exhibits listed in the decision).)

[8] Records from Dr. Kezlarian indicate Plaintiff was trying to reduce his child support around 2007. (R. 7, 826.)

back and forth on his couch. (R. 7, 53.) Pressing needs, such as his health and taxes, went

unattended. (R. 7, 54-55.) He did not socialize or get out much, but from 2005 until 2008

he attended most University of Michigan football games with his friends. (R. 7, 55-56.) He

tried other things, too, such as writing up posters with positive slogans on the wall, and yet

"my friends couldn't understand" why he struggled, nor could he. (R. 7, 60-61.) Hygiene

did not matter to him at times. (R. 7, 61-62.) And none of the medications seemed to help.

(R. 7, 64.)

A service organization, Mission Rehabilitative Services, helped Plaintiff get his

medical license back, assisting in filling out the application. (R. 7, 69.) He did not have to

attend classes, but he answered questions in journals, which he sent in; later the system

went online. (R. 7, 69.) The process made him anxious and took a long time. (R. 7, 70.)

But there was "[n]o question" he was doing better in 2011 than in the preceding six years.

(*Id.*)

The ALJ then asked the VE to consider a hypothetical individual with Plaintiff's

characteristics, who was

> limited to simple, routine, repetitive tasks, that require little judgment, short
> period of time; with no production line work, where somebody else's job
> responsibilities would be directly linked to his output; with no interaction
> with the general public, could have some superficial contact; and also, could
> have occasional interaction with co-workers, could be in proximity, but not
> as a team member.

(R. 7, 81.) These restrictions would eliminate Plaintiff's past employment, the ALJ

acknowledged, but could the individual perform other work? (*Id.*) Yes, the VE replied: as

a park worker (51,000 positions nationally, 1000 in Michigan); in medium-exertion hand

packaging (50,200 nationally, 1300 in Michigan); and in light-exertion hand packaging

(46,000 nationally, 2300 in Michigan). (R. 7, 83.) The VE also testified that employers

typically expect employees to be off-task no more than 10 percent of the time. (R. 7, 83.)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability

decision. 42 U.S.C. § 423(d)(5)(B). The regulations[9] carve the evidence into various

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513

(2016). "Acceptable medical sources" include, among others, licensed physicians and

---

[9] Various amendments have been made to the regulations since Levine filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the

22

claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[10] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting

---

[10] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)    Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). The RFC "is the most [the claimant]

24

can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.   Analysis

#### i.   *Res Judicata* and the Controlling Application Date

Before turning to Plaintiff's sole substantive argument, two matters must be addressed. The first is Plaintiff's discussion of *res judicata* in his briefing, which he styles as his first argument. (R. 13, PageID 984-95; R. 16, PageID 1016.) The issue arises because of his past unsuccessful applications for benefits. See *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018) (noting that *res judicata* bars relitigation of past final decisions). But as it turns out, neither side here argues that the administrative denial of Plaintiff's 2007 application bars, by *res judicata*, the current application. The Commissioner does not make such an argument, (R. 15, PageID 1010), and Plaintiff explains that he included the issue because the Court's scheduling order asked the parties to address *res judicata*. (R. 16, PageID 1016 ("Defendant's motion fails to appreciate the reason for the inclusion of a res judicata issue in plaintiff's motion. . . . Plaintiff certainly is not asserting any error in that regard.").) Consequently, no argument regarding *res judicata* is before the Court.

Nor has any argument been developed on the second threshold matter: Plaintiff's contention that his present case stems from his 2010 application, not the 2013 application.

25

(R. 13, PageID 974.) In his procedural history section, Plaintiff notes the following: that he argued at the hearing that no 2013 application had been filed, that the record contains no actual application from 2013 (only a document purporting to be an "application summary" of the 2013 application), that the record contains his 2012 request for reconsideration of the denial of his 2010 application, that the record lacks any order responding to his reconsideration request, and that he contended (at some indefinite point, likely the hearing) the initial denial of his claim in 2014 (the one before the Court now) "was actually a decision made on reconsideration." (*Id.*) Yet the ALJ, and now the Commissioner before this Court, represent (without any analysis) that the present claim arises from the 2013 application. (R. 7, 11; R. 15, PageID 998.)

Plaintiff's entire discussion on this point comes in the first full page of his procedural history. (*Id.*) And it is descriptive rather than analytical, stating what he had argued below rather than what he is arguing now. Thus, he has not marked it as an argument or explained why it is legally relevant to the task before the Court, i.e., reviewing the ALJ's decision. It appears, rather, that selecting the appropriate application date relates to the period for which Plaintiff could receive benefits *if* he is entitled to them.[11] This is due to 42 U.S.C. § 423(b), which limits payment of retroactive benefits to the 12 months preceding the application date. See *Yeiter By & Through Yeiter v. Se'y of Health & Human Servs.*, 818 F.2d 8, 9 (6th Cir. 1987) (observing the statute's "one-year limit on retroactive

---

[11] Generally, another possible result of selecting the newer application is that his claim could be subject to *res judicata*, see *Bloch on Social Security*, § 4:9 (2018), but as noted above, that is not the case here.

benefits"); *see also* 20 C.F.R. § 404.621(a)(1) ("[Y]ou may receive benefits for up to 12 months immediately before the month in which your application is filed.").

This statutory limitation becomes critical when a claimant, like Plaintiff here, seeks benefits for a closed period that ended before he or she applied. To obtain benefits in such cases, the disability period must overlap with the retroactive period—the retroactive benefits begin when the claimant meets all requirements (i.e., is disabled), 20 C.F.R. § 404.621(a)(1), and generally end at some point shortly after the disability ceases, 42 U.S.C. § 423(a)(1). The longer the gap between the end of the disability period and the application date, the less of the disability period a claimant is potentially entitled to, *see* 3 *Social Security Law & Prac.* § 39.66 (2018) ("When the claimant has a closed period of disability, a delay between the date disability ceased and the date the claimant filed an application may affect how many months of retroactive cash benefits he or she can receive."). According to the Commissioner's internal manual, if the disability ended more than 14 months prior to the filing date—representing the 12 months of retroactivity and a 2-month grace period—no benefits are payable. See Soc. Sec. Admin., Program Operations Manual System (POMS) DI 25510.001 (July 2015); POMS, DI 25510.010 (Nov. 2016).

Under this framework, the date of the application matters.[12] Plaintiff requested a

---

[12] And though Plaintiff has neither here nor below articulated the legal basis for his motivation for the 2010 application to control, his counsel at the hearing did say briefly, "Because, the 2013 [application] only goes back one year . . . [and] gives this gentleman, the Claimant, who has an excellent work record, no benefits, if you find him disabled, because it's out – it's within that closed period. . . . So 2010 is crucial, because that would take us back to 2009." (R. 7, 31.)

period of closed benefits from June 30, 2005, until May 2012. (R. 7, 281.) The April 2010 application would put Plaintiff safely inside the closed period, permitting him to take full advantage of the retroactive benefits. The October 13, 2013 application, on the other hand, would endanger Plaintiff's right to any benefits whatsoever, even if he was disabled during the closed period.

His failure to present any argument on the matter, however, means this issue should not be resolved presently. In any event, the issue arises only if the Plaintiff is found disabled—and the disability determination is based on the same general evidentiary record, no matter the application date. Thus, his substantive claim regarding the ALJ's decision can and should be addressed now despite Plaintiff's statements questioning the application date. Finally, if a remand were appropriate regarding the ALJ's decision on the merits— and I do not recommend one below—the Commissioner would be in a much better position to address the application date on remand than the Court is now, given the lack of developed argument and the murky nature of Plaintiff's contentions.[13]

---

[13] Indeed, the most elaborate explanation Plaintiff has appeared to offer for the matter came at the hearing, when he suggested that the local Social Security office "manufacture[d] a 2013 application, because . . . they did not follow through with what they were supposed to do on the reconsideration request" regarding the 2010 application. (R. 7, 30.) He wanted the office "called on the carpet for it. . . . [b]ecause, honestly, it – to me, it's shenanigans." (R. 7, 35.) As it stands now, the record contains an application from April 14, 2010, for Title II Disability Insurance Benefits and benefits under Part A of Title XVIII of the Social Security Act, codified at 42 U.S.C. § 1395c-1395i-5, which refers to Medicare benefits, from April 14, 2010. (R. 7, 218-19.) It is captioned as an "application summary," the same title as on the 2013 application. (R. 7, 190.) The record also contains a letter to Plaintiff (dated the same day as the 2010 application) explaining that the Commissioner had "made an informal decision that you are not eligible for SSI [*i.e.*, Supplemental Security Income]" because "[y]ou [i.e., Plaintiff] told us that you do not want to file a claim for SSI." (R. 7, 155.) But SSI falls under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f,

28

### ii.   Treating Physician

Plaintiff's substantive argument is that the ALJ mishandled Dr. Kezlarian's medical opinion, which was entitled to controlling weight unless the ALJ articulated good reasons for a lesser weight. 20 C.F.R. § 404.1527(c)(2). The first problem Plaintiff discerns is that the ALJ did not specifically mention Dr. Kezlarian's post-hearing deposition testimony. (R. 13, PageID 987-88.) He speculates that since the statement was labeled differently than most evidence, "it may be that the ALJ did not consider it at all." (*Id.* at PageID 987.) But the ALJ said he considered "all the evidence," and the exhibit list appended to the decision includes the deposition transcript. (R. 7, 12, 23.) Further, Plaintiff does not cite any authority for the implicit suggestion that the ALJ must mention each report from a medical source. To the contrary, "An ALJ need not discuss every piece of evidence in the record for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Indeed, a purpose of the "good reasons" rule is to facilitate meaningful review of the ALJ's rationale, which is possible here. See *Rogers*, 486 F.3d at 243. As such, Plaintiff's threshold argument does not carry the day.

The rest of Plaintiff's relatively brief argument takes aim at a few of the reasons the ALJ gave for discounting Dr. Kezlarian's opinion. (R. 13, 988-89.) Plaintiff raises some valid concerns with the ALJ's analysis, although ultimately I conclude the ALJ gave good

---

and there is no application for such benefits. The next relevant document is a request for reconsideration from August 16, 2012; the section for the Commissioner to complete remains blank. (R. 7, 127.) Without additional evidence, then, it would be difficult to resolve what happened with the 2010 application.

reasons for his decision. One such concern, for example, is the ALJ's reliance on Dr. Kezlarian's observation that Plaintiff had "static symptomology." (R. 7, 16-17.) It is not entirely clear what point the ALJ was hoping to make. The ALJ's first comment on the static symptoms qualified the preceding sentence dealing with medication noncompliance and missed appointments—"[d]espite" these lapses, the ALJ noted, the symptoms remained the same, and he did not require increased treatment or emergency care. (R. 7, 16.) The implication, apparently, is that Plaintiff must not have been so bad off if he could remain the same during periods without medication or treatment. But the ALJ cites only two records for support; one noted that Plaintiff was a "no show" at a single appointment, (R. 7, 757), and the other appears to say, "[m]iss a dose of med[ication]," (R. 7, 768). This is hardly a tale of irregular compliance. Measuring Plaintiff's symptoms against a missed appointment and a forgotten dose seems unenlightening.

Even so, the static nature of Plaintiff's symptoms cannot be considered without also asking at what level of severity they reached stasis, *i.e.*, did they stay the same but were not bad? In this respect, the record from Dr. Kezlarian's notes is more mixed. The reports often characterize Plaintiff's "response/progress" as "stable," see, e.g., (R. 7, 798, 806, 808, 820, 821, 823, 833, 834, 836, 837), but the import of this observation is unclear. "Stable" suggests consistency. *Oxford English Dictionary* (Online ed.) (defining "stable" as, among other things, "[n]ot liable to fail or vary"; "[n]ot changing, constant"). If a crippling depression's stability simply meant it was consistent, the stability would be a curse. Of course, it was the "response/progress" that was "stable," suggesting that it was the evolution of Plaintiff's status that was consistent. Further muddying the water are the

other options (listed on the preprinted forms) that were distinguished from "stable," such as "slow," "no improvement," "minimal," "worsening," and "improving." (*Id.*) Sometimes, Dr. Kezlarian also circled "slow." See, e.g., (R. 7, 806, 808, 823.) Consequently, reliance on "stability" to prove Plaintiff's improvement is not entirely convincing.

The other evidence of symptoms in Dr. Kezlarian's records also points in both directions. His testimony and his capacity assessments certainly suggested that the symptoms were dire, impairing multiple capabilities. (R. 7, 311-16, 863-64, 879-80, 884-87.)[14] The treatment notes, too, consistently mention depression, anxiety, lack of motivation, and the like. *See, e.g.*, (R. 7, 754, 755, 757, 773, 775, 798, 804, 808, 811, 838, 839, 847, 848, 850.) At the same time, however, other notes indicate some improvement or even a lack of depression or anxiety. *See, e.g.*, (R. 7, 752, 768, 808, 835.) In addition, the treatment notes themselves do not speak directly to the severity of the symptoms.

Thus, it is difficult to reach firm conclusions concerning the severity of the symptoms recorded in Dr. Kezlarian's records. In light of the ambiguous and conflicting evidence, the ALJ's perception of staticity in Plaintiff's symptom's is not, on its own, a "good reason" for rejecting Dr. Kezlarian's opinion.

Other aspects of the ALJ's analysis are also unconvincing. For example, he noted

---

[14] Plaintiff contends that Dr. Kezlarian "characterized plaintiff's major depression as 'severe' (Tr. 306), and static symptomatology thereafter suggests that it remained severe and therefore disabling." (R. 13, PageID 988.) But he provides no evidence that Dr. Kezlarian's use of "severe" equates with the statutory definition of "disabled." And, in fact, his reply brief appears to agree that "how the doctor [i.e., Dr. Kezlarian] uses the word 'severe' . . . is not equivalent of the Social Security usage." (R. 16, PageID 1018.)

that Plaintiff ceased treating with Dr. Kezlarian in May 2010 but did not begin receiving treatment until November 2010. (R. 7, 17.) "There is thus a gap in treatment but no increase in symptoms. This would be expected with depression of the alleged severity." (*Id.*) The ALJ does not explain or justify the underlying supposition that the symptoms' severity would increase without treatment for six months. It might be true; but Dr. Kezlarian testified that patients with Plaintiff's conditions were not "flatlined down at the bottom," but had "variations [in their mood] within days, weeks and months." (R. 7, 334.) In fact, he said, post-treatment progress was consistent with these cycles of depression. (R. 7, 336-37.) And, again, the ALJ does not discuss the specific symptoms that remained static. Thus, the gap itself and any continuity in Plaintiff's condition is not necessarily probative of his disability or Dr. Kezlarian's opinions.[15]

Despite these issues, the ALJ ultimately assembled enough good reasons for his treatment of Dr. Kezlarian. One was Plaintiff's ability to travel, which he did a few times to attend family crises in Arizona and a wedding in Colorado. A few trips over the course

---

[15] Plaintiff also states that "[c]ertainly, a party is not required to seek emergency care or hospital admission to establish disability, as the ALJ intimates." (R. 13, 988, citing R. 7, 16.) The ALJ did observe that Plaintiff had not been hospitalized, but he did not suggest that such hospitalization was necessary. While it may be questionable whether the lack of emergency care is relevant in this context, cf. *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 420 (W.D. N.Y. 2006) (noting that the lack of hospitalization for mental disorders is not a dispositive basis for rejecting a treating source opinion), the ALJ did not significantly rely on this rationale.

Similarly, the ALJ noted (but did not discuss at length) that Plaintiff "had sufficient mental abilities to try to modify his child support." (R. 7, 16.) This is true, but the ALJ failed to report that the modification appears to have been related to Plaintiff's arrest for falling behind in payments. (R. 7, 46, 826.) Obtaining a modification might provide some evidence of his capabilities; in these circumstances, however, it is at best neutral.

of multiple years typically might not be strong evidence of an ability to work. Cf. *Hostrawser v. Astrue*, 364 F. App'x 373, 378 (9th Cir. 2010) (noting that the ability to travel does not necessarily indicate the ability "to undertake the *physical* functions" required by sustained work (emphasis added)). However, as the ALJ noted, some of these travels were prompted by emergencies. (R. 7, 16, 831, 840-41.) This impressed one therapist because, when Plaintiff was needed, he "was able to not give a second thought to family issues or his depression, and immediately flew to see family when it was needed." (R. 7, 630.) The travels thus demonstrate an ability to handle stress. And the records suggest he both flew and drove to Arizona, which require navigating different tasks and schedules and, in the case of driving, exercising prolonged attention to those tasks. (*Id.*)[16] Thus, this evidence demonstrates Plaintiff's ability to adequately handle simple requirements under pressure, see generally *Roybal v. Astrue*, 224 F. App'x 843, 848 (10th Cir. 2007) (noting that the plaintiff's ability to travel on her own from North Carolina to Utah by bus indicated "she can undertake activities outside her house by herself and she can take care of herself"); *Butler v. Colvin*, No. 3:13–cv–02156, 2014 WL 6610017, at *7 (D. Ore. Nov. 19, 2014) (noting that ability to travel supported the ALJ's conclusion that the plaintiff was not disabled). The ALJ appropriately accounted for this evidence by limiting the RFC to

---

[16] Plaintiff says that he ran out of gas four times on one drive, (R. 13, PageID 988), but the record does not support the assertion that all four occasions occurred during a single trip, (R. 7, 826). Plaintiff also objects that he characterized the trip as "tough" to Dr. Kezlarian, (R. 7, 988; R. 13, PageID 755), but even non-disabled individuals can find travel "tough" and Plaintiff nonetheless successfully completed his trips. The evaluator at Jewish Network Services noted that Plaintiff was "slowly improving" after one difficult trip to Arizona. (R. 7, 630.)

"simple, routine, repetitive tasks (requires little judgment and can be learned in a short period of time)." (R. 7, 15.)

Likewise, the ALJ observed that Plaintiff took care of his father when he lived in Arizona. (R. 7, 17-18.) At the hearing, Plaintiff said he was "[n]ot really" a caregiver, though he did take his father on drives, (R. 7, 62); but shortly after leaving Arizona he told Dr. Kaye that he had become a full-time caretaker, (Tr. 7, 902, 904). To be sure, this role did not last long, but the ALJ could properly cite it as evidence that Plaintiff had greater capabilities than Dr. Kezlarian surmised.

For many of the same reasons, Plaintiff's recreational activities provide some evidence for discounting Dr. Kezlarian's opinion. The ALJ's decision relies on Plaintiff's reading medical journals, taking a Japanese flower course, and attending football games. (R. 7, 14-15; see R. 7, 44, 46, 55-56.) A single course on flowers does not prove an ability to maintain a regular work schedule, but the ALJ was not unreasonable to think it gave some (albeit limited) insight into his ability to concentrate. Reading medical journals no doubt requires greater focus, although again reading an article is not the same as sustaining attention over the course of a workday. Still, it sheds a little light on whether he could concentrate on intricate subject matter. Watching football is more passive, but the ALJ could properly cite the fact that he attended the games with friends as evidence of his social interactions and abilities. On the whole, then, the recreational activities add some support the ALJ's conclusion.

Next, the ALJ also appropriately pointed to Plaintiff's job search, temporary employment, and the reinstatement of his medical license. (R. 7, 16-18.) Of the former, the

ALJ noted that "job hunting . . . does not suggest he felt unable to work." (R. 7, 16.) Courts have held that job hunting is evidence that can cut against disability. See, e.g., *Dowlen v. Colvin*, 658 F. App'x 807, 812 (7th Cir. 2016) (noting that the ALJ can consider the fact that a claimant is "looking for work," and that the claimant there did not "explain how she could be able to take on new work if her pain was as severe as she said"); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (noting that the ALJ could discredit the plaintiff's claim of debilitating illness due to her recent work experience and the fact she "sought out other employment since then"); *Coleman v. Comm'r of Soc. Sec.*, No. 15-cv-13289, 2016 WL 5388949, at *4 (E.D. Mich. July 27, 2016) (noting the ALJ could rely on evidence that the plaintiff continued to seek employment), *rep. & rec. adopted by* 2016 WL 5341099 (Sept. 23, 2016); *Ronning v. Colvin*, No. 14-11893, 2016 WL 3319690, at *3 (E.D. Mich. May 20, 2016) (noting that the ALJ's reliance on the plaintiff's continued job search was reasonable and supported the credibility finding), *rep. & rec. adopted by* 2016 WL 3181906 (E.D. Mich. June 8, 2016); *Brown v. Comm'r of Soc. Sec.*, No. 12-14829, 2014 WL 1118407, at *16 (E.D. Mich. Mar. 21, 2014) (same). But such evidence must be handled with care because a mere desire to work might express nothing else than the hope of leading a normal life, and seeking work might be a reaction to dire financial straits. See *Voigt v. Colvin*, 781 F.3d 871, 876-77 (7th Cir. 2015); *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

Here, there is no indication that the ALJ read too much into Plaintiff's job search, nor was Plaintiff simply asserting a desire to work in the abstract or that a desperate need for funds drove his job hunt. While his search was not continuous across the record, it

occurred at least through 2006 and then again towards the end of the closed period, around 2010 and onwards. (R. 7, 403, 405, 678, 715, 752, 778, 823.) The ALJ could properly look to this evidence to conclude that Plaintiff's impairments were not as severe as Dr. Kezlarian claimed. Similarly, Plaintiff's sales job, which he held for a few months around 2010, (Tr. 7, 724, 732), provides support for the ALJ's conclusion, as work experience is valid evidence under the regulations. See 20 C.F.R. § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."). Such evidence, however, can cut both ways—if successful, it might show an ability to work, but if unsuccessful, it might demonstrate that a claimant cannot hold a job. See, e.g., *Fenner v. Comm'r of Soc. Sec.*, No. 3:12–cv–179, 2013 WL 2253573, at *6 (S.D. Ohio May 22, 2013) (finding that the ALJ could consider plaintiff's work attempts even if they were unsuccessful). Here, Plaintiff does not contend he lost the job due to his impairments; rather, he said, "I don't really know why" the employer let him go. (R. 7, 724.) Further, even though Plaintiff said he received help reinstating his medical license, it was a fair inference that the process required some work on his part. See, e.g., M.C.L. § 333.16245, 333.16247 (describing the detailed requirements for reinstatement of medical licenses).

Further bolstering the ALJ's conclusion is Dr. Kaye's report. Plaintiff briefly contends that the report actually is consistent with Dr. Kezlarian's opinion because they both thought Plaintiff's troubles came to a head when his marriage ended. (R. 13, 989.) But

this rather immaterial correspondence is where the similarities end. Dr. Kaye's testing produced high scores across the board, including on processing, memory, and intelligence. (R. 7, 910-11.) The high IQ, in particular, led Dr. Kaye to believe that Plaintiff was "fully capable of returning to his work as a physician," and he encouraged Plaintiff to seek relicensing. (*Id.*) This opinion came after multiple sessions and could be relied upon to discount Dr. Kezlarian's.

The other treatment notes also undercut Dr. Kezlarian's view. As the ALJ discussed, (R. 7, 17), the materials from Community Network Services include relatively normal mental status examinations and a GAF score of 60, well above Dr. Kezlarian's score of 40 and indicating only moderate limitations. (R. 7, 680, 683, 689, 692, 701, 710, 716, 719, 725, 728, 734, 737, 743-44.) Some of these records cast doubt on the severity of his anxiety and depression. In one record, Plaintiff said he was anxious only "some times." (R. 7, 732.) A 2009 record from Dr. Skoney talked of treatment options "if [his] depression comes back." (R. 7, 400.) Likewise, Plaintiff commented in 2009 that while his psychiatrist (presumably Dr. Kezlarian) thought he should apply for Social Security benefits based on depression, he was "not convinced," (R. 7, 641), although eventually he applied, (R. 7, 658). A therapist at Jewish Family Services noted improvements, (R. 7, 630), and did not discern "any signs of depression that may render him unable to work," (R. 7, 641). That therapist's final assessment, rendered in June 2010, stated that Plaintiff "has now progressed to a fully functioning independent state" and had a GAF score of 67, indicating only mild symptoms. (R. 7, 611.) At the hearing, Plaintiff himself admitted that he was feeling better by 2011. (R. 7, 70.) And, as the ALJ observed, (R. 7, 18), the Commissioner's

medical consultant also concluded that Plaintiff could perform simple and routine tasks. (R. 7, 94.) This evidence all gives additional support for the ALJ's decision.

Thus, although not all his rationales were equally convincing, the ALJ gave good reasons for his assessment of Dr. Kezlarian's opinion. None of Plaintiff's arguments persuade otherwise.

### iii.   Re-opening the 2007 Application

One last issue must be addressed. In a memorandum to the ALJ, Plaintiff explained that his mental illness prevented him from appealing the initial denial of his 2007 application. (R. 7, 286.) He contended that this gave him "good cause" under Social Security Ruling 91-5p, 1991 WL 208067 (July 1, 1991), for failing to timely appeal and that the ALJ should re-open the 2007 application. (R. 7, 286.) The ALJ rejected this argument in his written decision. (R. 7, 11.)

Tucked at the very end of Plaintiff's brief before this Court, he broaches re-opening the denial of his 2007 application: "Additionally, such a remand [to the Commissioner] should revisit the question of whether plaintiff had the mental wherewithal to file a timely review from the 2007 denial in light of the weight to be accorded Dr. Kezlarian's opinion." (R. 13, PageID 989.) This is all he mentions of the matter in his argument section.

It is not clear that Plaintiff intends to raise an argument on this issue or to ask that we remand specifically for reconsideration of the re-opening decision. Rather, it appears that he thinks a remand is warranted concerning Dr. Kezlarian's opinion and that this might result in the ALJ reconsidering re-opening on remand. To the extent he is attempting to present this issue to the Court, he faces two problems. As an initial matter, it is fatally

underdeveloped, and thus forfeited. See *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677 (6th Cir. 2018) (noting that the Sixth Circuit has "repeatedly held that a party forfeits any allegations that lack developed argument"), *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.").

More fundamentally, the Court lacks jurisdiction to review the Commissioner's decision on re-opening a claim. Under 42 U.S.C. § 405(g), "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced" within a certain period. The Supreme Court has held that "[t]his provision clearly limits judicial review to a particular type of agency action, a 'final decision of the Secretary made after a hearing'. But a petition to reopen a prior final decision may be denied without a hearing," and thus is not subject to judicial review. *Califano v. Sanders*, 430 U.S. 99, 108 (1977).

The Commissioner presents this well-established caselaw in its brief. (R. 15, PageID 1008.) Plaintiff replies that no hearings were held in the cases the Commissioner cites, whereas one occurred here. (R. 16, 1019.) But the caselaw is clear that the mere holding of a hearing that addresses re-opening is irrelevant because it is not mandatory; this is true even when, as in this case, the re-opening issue was discussed at a hearing on the merits of a disability claim and decided in the ALJ's later determination on the merits. See *Dozier v. Bowen*, 891 F.2d 769, 771 (10th Cir. 1989) ("'All circuits that have considered the question after [*Califano v.*] *Sanders* have held that a decision of the Social Security Administration

(SSA) not to reopen is unreviewable, whether or not the SSA held a hearing on whether good cause for the late filing was shown.'" (citation omitted)); *Cappadora v. Celebrezze*, 356 F.2d 1, 4 (2d Cir. 1966) ("On a strictly literal reading, § 405(g) could be interpreted as applying to any final decision of the Secretary that was handed down after a hearing, albeit a hearing not required by the statute. Such an interpretation, however, would be unnatural and unsound . . . . the reasonable reading of § 405(g) is that it was intended to apply to a final decision rendered after a hearing thus made mandatory, not to a decision which could lawfully have been made without any hearing at all and in that event plainly would not have come under the terms of the section."); *Dixon v. Chater*, 954 F. Supp. 58, 59, 62 (E.D. N.Y. 1997) (holding that, even though the plaintiff moved for re-opening at a hearing on the merits of his later disability claim, the court lacked jurisdiction to review the denial of that motion); Bloch, *Bloch on Social Security*, § 6:1 (2018) ("Logically, *Sanders* applies to all decisions to refuse to reopen a claim, even if a hearing was held on that issue."). Thus, I suggest the Court lacks jurisdiction to entertain this issue, if Plaintiff is even attempting to raise it.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (Doc. 13), **GRANTING** the Commissioner's Motion, (Doc. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2018                         S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 31, 2018                           By s/Kristen Castaneda
                                                 Case Manager